# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **TRANS1, LLC,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | |
| **BLUE CROSS BLUE SHIELD ASSOCIATION,** | **NO. 25-1422** |

**TRANS1, LLC,**
          **Plaintiff,**

      **v.**

**BLUE CROSS BLUE SHIELD ASSOCIATION,**
**BLUE CROSS AND BLUE SHIELD OF ALABAMA,**
**PREMERA BLUE CROSS, doing business as "PREMERA BLUE CROSS AND BLUE SHIELD OF ALASKA,"**
**BLUE CROSS BLUE SHIELD OF ARIZONA, INC.,**
**USABLE MUTUAL INSURANCE COMPANY, doing business as "ARKANSAS BLUE CROSS AND BLUE SHIELD,"**
**BLUE CROSS OF CALIFORNIA, doing business as "ANTHEM BLUE CROSS,"**
**BLUE SHIELD OF CALIFORNIA,**
**ROCKY MOUNTAIN HOSPITAL AND MEDICAL SERVICE, INC., doing business as "ANTHEM BLUE CROSS AND BLUE SHIELD COLORADO,"**
**ANTHEM HEALTH PLANS, INC., doing business as "ANTHEM BLUE CROSS AND BLUE SHIELD OF CONNECTICUT,"**
**HIGHMARK BCBS, INC., doing business as "HIGHMARK BLUE CROSS BLUE SHIELD DELAWARE,"**
**CAREFIRST OF MARYLAND, INC., doing business as "CAREFIRST BLUECROSS BLUESHIELD,"**
**GROUP HOSPITALIZATION AND MEDICAL SERVICES INC., doing business as "CAREFIRST BLUECROSS BLUESHIELD,"**
**BLUE CROSS AND BLUE SHIELD OF FLORIDA, INC., doing business as "FLORIDA BLUE,"**

**CIVIL ACTION**

**NO.  25-1422**

**TRIPLE-S MANAGEMENT CORPORATION, doing business as "BLUECROSS BLUESHIELD OF PUERTO RICO,"**
**BLUE CROSS BLUE SHIELD HEALTHCARE PLAN OF GEORGIA, INC., doing business as "ANTHEM BLUE CROSS AND BLUE SHIELD OF GEORGIA,"**
**HAWAII MEDICAL SERVICE ASSOCIATION, doing business as "BLUE CROSS AND BLUE SHIELD OF HAWAII,"**
**BLUE CROSS OF IDAHO HEALTH SERVICE, INC., doing business as "BLUE CROSS OF IDAHO,"**
**REGENCE BLUESHIELD OF IDAHO, INC.,**
**HEALTH CARE SERVICE CORPORATION, doing business as "BLUE CROSS AND BLUE SHIELD OF ILLINOIS,"**
**ANTHEM INSURANCE COMPANY, INC., doing business as "ANTHEM BLUE CROSS AND BLUE SHIELD INDIANA,"**
**WELLMARK, INC., doing business as "WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA,"**
**BLUE CROSS AND BLUE SHIELD OF KANSAS, INC.,**
**ANTHEM HEALTH PLANS OF KENTUCKY, INC., doing business as "ANTHEM BLUE CROSS AND BLUE SHIELD KENTUCKY,"**
**LOUISIANA HEALTH SERVICE & INDEMNITY COMPANY, doing business as "BLUE CROSS AND BLUE SHIELD OF LOUISIANA,"**
**ANTHEM HEALTH PLANS OF MAINE, INC., doing business as "ANTHEM BLUE CROSS AND BLUE SHIELD MAINE,"**
**BLUE CROSS BLUE SHIELD OF MASSACHUSETTS, INC.,**
**BLUE CROSS BLUE SHIELD OF MICHIGAN MUTUAL INSURANCE COMPANY, doing business as "BLUE**

2

**CROSS BLUE SHIELD OF MICHIGAN,"
BCBS, INC., doing business as "BLUE
CROSS AND BLUE SHIELD OF
MINNESOTA,"
BLUE CROSS & BLUE SHIELD OF
MISSISSIPPI, doing business as "BLUE
CROSS & BLUE SHIELD OF
MISSISSIPPI,"
HEALTHY ALLIANCE LIFE
INSURANCE COMPANY, doing business
as "ANTHEM BLUE CROSS AND BLUE
SHIELD MISSOURI,"
HOM MISSOURI, INC., doing business as
"ANTHEM BLUE CROSS AND BLUE
SHIELD MISSOURI,"
BLUE CROSS AND BLUE SHIELD OF
KANSAS CITY,
HCSC, doing business as "BLUE CROSS
AND BLUE SHIELD OF MONTANA,"
BLUE CROSS AND BLUE SHIELD OF
NEBRASKA, INC.,
COMMUNITY CARE HEALTH PLAN
OF NEVADA, INC., doing business as
"ANTHEM BLUE CROSS AND BLUE
SHIELD NEVADA,"
ANTHEM HEALTH PLANS OF NEW
HAMPSHIRE, INC., doing business as
"ANTHEM BLUE CROSS AND BLUE
SHIELD NEW HAMPSHIRE,"
HORIZON HEALTHCARE SERVICES,
INC., doing business as "HORIZON BLUE
CROSS AND BLUE SHIELD OF NEW
JERSEY,"
HCSC, doing business as "BLUE CROSS
AND BLUE SHIELD OF NEW MEXICO,"
ANTHEM HEALTHCHOICE
ASSURANCE, INC., doing business as
"ANTHEM BLUE CROSS" and
"ANTHEM BLUE CROSS AND BLUE
SHIELD," formerly known as "EMPIRE
HEALTHCHOICE ASSURANCE, INC.,"
HIGHMARK WESTERN AND
NORTHEASTERN NEW YORK INC.,
doing business as "HIGHMARK BLUE
CROSS BLUE SHIELD OF WESTERN
NEW YORK" and "HIGHMARK BLUE**

3

**SHIELD OF NORTHEASTERN NEW YORK,"**
**EXCELLUS HEALTH PLAN, INC., doing business as "EXCELLUS BLUECROSS BLUESHIELD,"**
**BLUE CROSS AND BLUE SHIELD OF NORTH CAROLINA,**
**BLUE CROSS AND BLUE SHIELD OF NORTH DAKOTA,**
**COMMUNITY INSURANCE COMPANY, doing business as "ANTHEM BLUE CROSS AND BLUE SHIELD OHIO,"**
**HCSC, doing business as "BLUE CROSS AND BLUE SHIELD OF OKLAHOMA,"**
**REGENCE BLUECROSS BLUESHIELD OF OREGON,**
**CAPITAL BLUE CROSS,**
**HIGHMARK INC., doing business as "HIGHMARK BLUE SHIELD" and "HIGHMARK BLUE CROSS BLUE SHIELD,"**
**INDEPENDENCE BLUE CROSS, doing business as "INDEPENDENCE BLUE CROSS,"**
**BLUE CROSS & BLUE SHIELD OF RHODE ISLAND,**
**BLUE CROSS AND BLUE SHIELD OF SOUTH CAROLINA,**
**WELLMARK OF SOUTH DAKOTA, INC., doing business as "WELLMARK BLUE CROSS AND BLUE SHIELD,"**
**BLUECROSS BLUESHIELD OF TENNESSEE, INC.,**
**HCSC, doing business as "BLUE CROSS BLUE SHIELD OF TEXAS,"**
**REGENCE BLUECROSS BLUESHIELD OF UTAH,**
**BLUE CROSS AND BLUE SHIELD OF VERMONT,**
**ANTHEM HEALTH PLANS OF VIRGINIA, INC., doing business as "ANTHEM BLUE CROSS AND BLUE SHIELD VIRGINIA,"**
**PREMERA BLUE CROSS,**
**REGENCE BLUE SHIELD,**
**HIGHMARK WEST VIRGINIA INC.,**

4

doing business as "HIGHMARK BLUE
CROSS BLUE SHIELD WEST
VIRGINIA,"
BLUE CROSS BLUE SHIELD OF
WISCONSIN, doing business as
"ANTHEM BLUE CROSS AND BLUE
SHIELD OF WISCONSIN," and
BLUE CROSS & BLUE SHIELD OF
WYOMING,
                          Defendants.

**MEMORANDUM**

**HODGE, J.**                                                      **July 1, 2026**

Before the Court is Defendants' Motion to Dismiss (ECF No. 110) (the "Motion"), the

opposition thereto (ECF No. 123), the reply in support (ECF No. 124), the notice of supplemental

authority in support of the Motion and the reply to the notice (ECF Nos. 131, 132), and oral

argument on the Motion. For the following reasons, the Motion is granted.

I.      **BACKGROUND**

        A.      **Factual Background**[1]

                1.      **L5-S1 Spinal Fusion Procedures**

Accepting the well-pleaded facts from the Complaint as true, the facts are as follows.

Spinal fusion is an in-patient surgery that joins or "fuses" adjacent spinal vertebrae. (ECF No. 1

¶ 77.) Single-level L5-S1 spinal fusion is a subtype of spinal fusion surgery that focuses on fusing

two vertebrae in the lower back: the fifth lumbar vertebra (L5) and the first sacral vertebra (S1).

(*Id.* ¶¶ 2, 77.) L5-S1 is intended to treat chronic pain and mobility issues. (*Id.* ¶ 78.) There are three

methods that can be used to perform L5-S1 spinal fusions: AxiaLIF, Anterior Lumbar Interbody

Fusion ("ALIF"), and Transforaminal Lumbar Interbody Fusion ("TLIF"). (*Id.* ¶¶ 77, 80.)

---

[1] The Court adopts the pagination supplied by the CM/ECF docketing system.

In the ALIF procedure, the surgeon accesses the vertebrae through the front of the patient by splitting the abdominal core muscles, moving the abdominal contents to one side, and retracting the major blood vessels to reach the spine. (*Id.* ¶ 81.) The surgeon performing the ALIF procedure removes the disc between the vertebrae, inserts a cage, and sometimes secures the cage with rods or screws—and this process may entail turning the patient over so the surgeon can place additional rods and screws. (*Id.* ¶ 82.) ALIF usually requires a vascular co-surgeon, and recovery from ALIF typically takes longer than three months and up to a year. (*Id.* ¶¶ 81, 83.) To perform TLIF, the surgeon cuts through the back muscles, removes most of the diseased disc, inserts a spacer, and then inserts screws and rods. (*Id.* ¶ 84.) Recovery from TLIF ranges from six weeks to up to a year. (*Id.* ¶ 85.)

To perform AxiaLIF, the surgeon approaches the vertebrae from a small incision near the tip of the tailbone. (*Id.* ¶ 87.) The surgeon drills a small channel to reach the disc space, and removes the diseased disc with proprietary AxiaLIF devices, irrigates the spaces with antibiotic solution, and fills the disc space with bone-graft material. (*Id.* ¶ 88.) The surgeon then inserts the AxiaLIF rod, a screw-like device, across the L5 and S1 vertebrae. (*Id.* ¶ 89.) The surgeon does not need to cut through core muscles and ligaments, and a vascular co-surgeon is not required. (*Id.* ¶ 87.)

Patients who undergo AxiaLIF require shorter hospital stays than patients who undergo ALIF or TLIF. (*Id.* ¶ 91.) Additionally, the risk of severe complications is more likely with ALIF and TLIF than with AxiaLIF. (*Id.* ¶ 92.) AxiaLIF is more cost-effective per patient than ALIF than TLIF. (*Id.* ¶ 93.) Additionally, AxiaLIF is often the only viable option for L5-S1 spinal fusion for patients contraindicated for ALIF or TLIF. (*Id.* ¶ 94.) Often, clinically obese patients have comorbidities making ALIF and TLIF too risky, which leaves AxiaLIF as the only viable option

for them. (*Id.*) While it is less costly for an insurer to cover a patient undergoing AxiaLIF as compared to ALIF and TLIF, because AxiaLIF expands the pool of patients who can obtain L5-S1 procedures, covering AxiaLIF would likely increase an insurer's overall reimbursement burden. (*Id.* ¶¶ 132, 133.)

AxiaLIF has been approved by the United States Food and Drug Administration ("FDA") since 2004. (*Id.* ¶ 96.) In 2012, the American Medical Association assigned the operative Category I Current Procedural Terminology ("CPT") code used for AxiaLIF. (*Id.* ¶ 97.) For a procedure to receive a Category I CPT code, the clinical efficacy of the procedure must be documented in literature. (*Id.* ¶ 98.) Peer-reviewed clinical studies have established that AxiaLIF is safe and effective. (*Id.* ¶ 99.) AxiaLIF has been endorsed as safe and effective by leading surgery associations. (*Id.* ¶ 102.) The FDA's adverse event database ("MAUDE") reports that adverse events resulting from AxiaLIF are mild and infrequent, and that no adverse events for single-level AxiaLIF have been reported since 2014. (*Id.* ¶ 100.)

Providers, hospitals, and patients rely on insurers for reimbursement for spinal fusions. (*Id.* ¶ 137.) AxiaLIF is reimbursed by Medicare and the U.S. Army, as well as by the United Kingdom's National Institute for Health and Care Excellence. (*Id.* ¶ 101.) Defendants reimburse for ALIF and TLIF, but not for AxiaLIF. (*Id.* ¶¶ 3, 80.)

Plaintiff TranS1, LLC ("TranS1") owns all rights to the AxiaLIF procedure and associated medical devices. (*Id.* ¶ 13.) The current TranS1 owners acquired the relevant intellectual property in 2022 and used the original firm name for continuity, but did not originally develop AxiaLIF in the 2000s or own and market AxiaLIF in the 2010s. (*Id.* ¶ 14.)

### 2.      BCBSA and Blue Plans

Defendants include Blue Cross Blue Shield Association ("BCBSA"), the federation of legally independent members plans that provide health insurance using the Blue Cross Blue Shield trademark and brand, and fifty-nine[2] BCBSA members and licensees spanning the entire United States (the "Blue Plans"). (*Id.* ¶¶ 15–76.) The Blue Plans operate as a Blue Cross entity within a designated local region. (*Id.* ¶ 104.)

Defendants insure about one in three Americans, comprising the largest insurance network in the United States. (*Id.* ¶ 137.) In some parts of the United States, Blue Plans enroll 90% or more of all private insureds. (*Id.* ¶ 141.) In Pennsylvania, for instance, three Blue Plans control 74% of the market for private health insurance. (*Id.*) The Blue Plans cooperate so they can offer in-network providers nationwide. (*Id.* ¶ 143.) The nationwide network of Blue Cross Blue Shield includes 96% of hospitals and 92% of doctors. (*Id.*)

BCBSA's Medical Policy Panel meets several times a year, usually at BCBSA's headquarters in Chicago, and sets the Model Policy. (*Id.* ¶ 107.) The panel includes representatives from the Blue Plans. (*Id.*) TranS1 alleges that Defendants have a "Uniformity Rule" in which they agree to adhere to the coverage directives of the Model Policy. (*Id.* ¶ 105.)

In 2011, Defendant Horizon Blue Cross Blue Shield of New Jersey provided a positive reimbursement decision for AxiaLIF. (*Id.* ¶ 110.) The following year, Defendant HCSC also provided a positive reimbursement opinion. (*Id.*) Hawaii Medical Services Association, then the Blue Cross Blue Shield provider for Hawaii, also provided a positive reimbursement opinion. (*Id.*)

---

[2] The Motion asserts that the Complaint is brought against BCBSA and thirty-three independent Blue Plans. (ECF No. 110-1 at 6.) The Court identifies fifty-nine Blue Plans listed in the Complaint, but no information from the Complaint nor the Motion on whether each is "independent."

8

But beginning no later than 2015 and continuing through today, the Blue Plans have all denied coverage for AxiaLIF. (*Id.* ¶ 112.)

The "2016 Medical Policy of HCSC" ("HCSC 2016 Policy") is used by various Blue Plans that are "HCSC" divisions. (*Id.* ¶ 113.) Its coverage policy states that AxiaLIF "is considered experimental, investigational, and/or unproven." (*Id.* ¶ 114.) It further cites to the FDA's MAUDE database, stating that it reports 131 adverse events through September 2013. (*Id.*) However, many of the 131 adverse events are duplicative, or concern the two-level variation of the procedure rather than the single-level L5-S1 procedure. (*Id.* ¶ 115.) Additionally, TranS1 asserts that the HCSC 2016 Policy inaccurately describes medical literature about single-level L5-S1 AxiaLIF. (*Id.* ¶ 117.) The 2024 Medical Policy of HCSC continues to inaccurately describe the medical literature. (*Id.* ¶ 118.)

Other Blue Plans use near verbatim language in their coverage policies on AxiaLIF. (*Id.* ¶¶ 121, 124). For instance, as of 2019, Highmark Blue Cross took the position similar to HCSC that the safety and/or effectiveness of AxiaLIF cannot be established by available published peer-reviewed literature, citing to the same studies mischaracterized by the HCSC policies, as asserted by TranS1. (*Id.* ¶ 119.) In 2017, the Anthem policy and Blue Cross Bule Shield of Michigan policy both cited to one study (the "Zeilstra study") to support their conclusion that AxiaLIF is investigational and presents an increased risk of complication, even though the Zeilstra study concluded that single-level AxiaLIF was "safe and effective." (*Id.* ¶¶ 121, 122.) Another study (the "Lindley study") is similarly characterized by several Blue Plans as having "found high complication rates" when the study concluded that the complication rate "was relatively low." (*Id.* ¶¶ 125–27.)

TranS1 alleges that as a result of the anticompetitive effects of BCBSA and the Blue Plans' collusive agreement, the market for spinal fusions is distorted and demand for AxiaLIF is substantially reduced. (*Id.* ¶ 151.) Fewer surgeons recommend AxiaLIF because the Blue Plans do not reimburse the procedure, resulting in fewer sales of the associated medical devices used to perform AxiaLIF. (*Id.*) Recourse for TranS1 is limited because if a Blue Plan denies coverage for a device, an appeal of that decision is determined by the same Blue Plans whom TranS1 alleges agreed to follow the Model Policy. (*Id.* ¶ 149.)

### B. Procedural History

On March 17, 2025, TranS1 filed its Complaint bringing a claim of group boycott violation of Section 1 of the Sherman Antitrust Act and Section 4 of the Clayton Act (Count I), and concerted refusal to deal in violation of Section 1 of the Sherman Antitrust Act and Section 4 of the Clayton Act (Count II). (ECF No. 1.) Defendants moved to dismiss the Complaint. (ECF No. 110.) TranS1 opposed the Motion (ECF No. 123), and Defendants filed a reply in support of the Motion (ECF No. 124). Defendants filed a notice of supplemental authority following the Sixth Circuit's determination in *Academy of Allergy & Asthma in Primary Care v. Amerigroup Tennessee, Inc.*, 155 F.4th 795 (6th Cir. 2025) (ECF No. 131), to which TranS1 responded (ECF No. 132). This Court held oral argument on the Motion on June 2, 2026.

## II. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, a complaint must put forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This requires more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements." *Id*. at 678 (citation omitted). "To survive dismissal, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Tatis v. Allied Interstate, LLC*, 882 F.3d 422, 426 (3d Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678).

Applying the principles of *Iqbal* and *Twombly*, the Third Circuit has articulated a three-part analysis to determine whether a complaint will survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *See Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). This three-prong inquiry involves the following: "(1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

## III.    DISCUSSION

In the Motion, Defendants argue that TranS1's Complaint must be dismissed for three reasons. First, they argue that TranS1 fails to plead the existence of an agreement through direct or circumstantial evidence. Second, they argue that TranS1 has failed to plead a cognizable product market. Lastly, Defendants argue that TranS1 lacks antitrust standing because it is an indirect seller with only speculative injury.

### A.    Existence of an Agreement

"Section 1 claims always require the existence of an agreement." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (citation modified). An agreement can be shown through either direct or circumstantial evidence. *LifeWatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 333 (3d Cir. 2018). For either direct or circumstantial, the plaintiff "must plead enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Value*

*Drug Co. v. Takeda Pharms., U.S.A., Inc.*, No. CV 21-3500, 2021 WL 6200907, at \*10 (E.D. Pa. Dec. 29, 2021) (citation modified).

### 1.    Direct Evidence of an Agreement

Direct evidence of a conspiracy is a "smoking gun," and "must evince with clarity a concert of illegal action." *Cosmetic Gallery, Inc. v. Schoeneman Corp.*, 495 F.3d 46, 52 (3d Cir. 2007). The Third Circuit in *Cosmetic Gallery* articulated several examples of direct evidence of a conspiracy: (a) a direct threat to the plaintiff from a competitor that if he went into business, his competitors would do anything to stop him; (b) advising distributors that a supplier would cut off access if the distributor failed to maintain a certain price level; (c) a memorandum produced by a defendant conspirator detailing the discussions of a group meeting of the alleged conspirators; and (d) a public resolution by a professional association recommending its members withdraw their affiliation with an insurer. *Id.*

Defendants argue that direct evidence of an agreement must be a "smoking gun" that requires no inferences. (ECF No. 110-1 at 10.)[3] TranS1's allegations about the "Uniformity Rule," on the other hand, do not include any allegations showing the when, where, or why the Rule was adopted. (*Id.* at 11–12.)[4] In response, TranS1 argues that binding associational rules are direct

---

[3] Defendant cites to cases at the summary judgment stage in support of this argument. However, as stated above, TranS1 need only plead enough fact to raise a reasonable expectation that discovery will reveal direct evidence of an agreement to survive a motion to dismiss.

[4] Additionally, Defendants attach a "Reference Manual" to the Motion reflecting language contrary to TranS1's allegations. (ECF No. 110-1 at 11.) A court may consider an undisputed authentic document that a defendant attaches as an exhibit to a 12(b)(6) motion to dismiss if plaintiff's claims are based on the document. *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993); *Levins v. Healthcare Revenue Recovery Grp. LLC*, 902 F.3d 274, 279–80 (3d Cir. 2018). Here, it is unclear if TranS1's claims are based on this document. As Defendants note in the Motion, TranS1 does not allege that the Uniformity Rule is in writing. (ECF No. 110 at 8.) The Court therefore cannot and does not consider the Reference Manual at this stage.

evidence of an agreement. (ECF No. 123 at 21 (citing *Relevent Sports, LLC v. United States Soccer Fed'n*, 61 F.4th 299, 307 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 1391 (2024)).)

*Relevent Sports* distinguished between two types of Section 1 cases involving trade organizational rules. 61 F.4th at 308. The first type of case alleges that a policy or rule is in service of a plan to restrain competition. *Id.* For these types of cases, a plaintiff must allege additional facts to show that an agreement to such a plan exists. *Id.* The second type of case is where a plaintiff adequately alleges that the policy or rule is the agreement itself. *Id.* For that type of case, a plaintiff need not have allegations of any further agreement. *Id.*

TranS1 alleges the second type of case identified in *Relevent Sports*. However, its allegations of the Uniformity Rule fall short of alleging a competition-restricting policy as shown in that case. In *Relevent Sports*, the plaintiff alleged a specific written policy agreed to on a certain date, and cited language from a press release from the FIFA Council. *Id.* at 304 ("Following a request for guidance . . . the [FIFA] Council emphasized the sporting principle that official league matches must be played within the territory of the respective member association."). But here, while TranS1 alleges regular meetings in Chicago and a general point in time where the Blue Plans no longer issued any positive reimbursement decisions for AxiaLIF, to this Court these allegations fall short of raising a reasonable expectation that discovery will reveal direct evidence of a conspiracy.

### 2.     Circumstantial Evidence of an Agreement

To plead an agreement through circumstantial evidence, a plaintiff must allege both parallel behavior and something "more," often called "plus" factors. *LifeWatch*, 902 F.3d at 333. The plus factors "could include evidence (1) that the defendant had a motive to enter into a conspiracy, (2) that the defendant acted contrary to its interests, or (3) implying a traditional conspiracy." *Id.*

(citation modified). The character of the conspiracy is to be viewed as a whole. *Id.* In cases of concentrated markets like the health insurance market alleged by TranS1, the first two types of evidence of plus factors are de-emphasized, as they "largely restate [that] phenomenon of interdependence." *Id.* (quoting *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004)). The third factor consists of "non-economic evidence that there was an actual, manifest agreement not to compete, which may include proof that the defendants got together and exchange assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 322 (3d Cir. 2010) (quoting *Flat Glass*, 385 F.3d at 361).

Defendants argue that TranS1 pleads neither parallel conduct nor sufficient plus factors. Specifically, the individual Blue Plans' AxiaLIF policies differ in their language and reasoning. (ECF No. 110-1 at 13 (comparing ECF No. 1 ¶ 114 with *id.* ¶ 129).) Even if choosing not to cover AxiaLIF is sufficiently parallel, Defendants posture there is no reasonable inference that the decisions were consciously parallel. (*Id.* at 14.) Using similar categorization of "experimental," "investigational," or "unproven" are merely terms of art, and using industry terminology does not imply conscious parallelism. (*Id.* (citing *In re Ins. Brokerage*, 618 F.3d at 328).) Defendants further assert that citing the same medical literature is what one would expect a rational health insurer to do. (*Id.*) As for plus factors, Defendants argue that a motive to save costs is not a motive to conspire nor contrary to individual interests. (*Id.* at 15.) They further argue that there is no evidence of a traditional conspiracy because there are no specific facts that the Blue Plans behaved the same as each other over time, or that they behaved differently than other commercial payors in the market. (*Id.* at 16–17.)

14

TranS1 argues that it alleges the same facts that the Third Circuit found sufficient to allege circumstantial evidence of an agreement in *LifeWatch*. (ECF No. 123 at 13.) The Court notes the numerous similarities between this case and *LifeWatch*. The plaintiff in *LifeWatch* alleged that BCBSA and five of its member plans impermissibly conspired with each other to deny coverage of telemetry monitors. *Id.* at 330. Specifically, the plaintiff alleged that the member plans agreed to the "Uniformity Rule" in which they agreed with each other and BCBSA to substantially comply with the model policy. *Id.* at 334. *LifeWatch* held that the plaintiff pleaded parallel conduct by alleging "the Blue Plans adopted the model policy's approach with near total uniformity and references [the policies'] use of similar or identical language to deny coverage." 902 F.3d at 333.

The Court agrees that TranS1 has pleaded parallel conduct. The Complaint asserts that by 2015, the Blue Plans denied coverage of AxiaLIF with total uniformity by using similar or identical language to deny coverage. While there is some variety in the language of different Blue Plans' AxiaLIF policies, *LifeWatch* found parallel conduct when policies used identical *or similar* language to deny coverage. *Id.* Although the complaint in *LifeWatch* went a step farther by quoting the provision of the model policy recommending the insurers deny telemetry monitor coverage, the Court finds that TranS1's allegations of several highly similar Blue Plan policies issued around the same time sufficiently plead parallel conduct. Moreover, while Defendants assert that the parallel conduct is due to an "obvious alternative explanation" that the Blue Plans deny coverage for AxiaLIF because it is experimental and lacks sufficient clinical evidence (ECF No. 110-1 at 17–18), the Complaint's allegations that some Blue Plans approved coverage of AxiaLIF prior to 2015 contradict that explanation.

*LifeWatch* found sufficient allegations pleading plus factors "implying a traditional conspiracy" by alleging "the type of agreement reached by the Blue Plans and the Association, an

15

auditing mechanism by which the agreement is enforced, a particular time when a Blue Plan declined to cover telemetry monitors due to pressure from the Association and other Plans, and the improbability that the same coverage decision would be reached by nearly all the Blue Plans independently." 902 F.3d at 334.

TranS1 similarly alleges the type of agreement reached and a particular time when it was reached. But TranS1's allegations of plus factors fall short of the allegations in *LifeWatch* in two key respects. First, the *LifeWatch* complaint provides an example of the Uniformity Rule's enforcement: one of the insurers initially contracted with LifeWatch to cover prescriptions for telemetry monitors, but allegedly stopped paying for claims to other Blue Plans. Second, *LifeWatch* alleged that other commercial insurers covered its product, and that independent boards had overturned the defendants' denial of coverage determinations.

While those allegations in *LifeWatch* strengthened the plus factors, the Court does not find the absence of those allegations fatal to TranS1's claim at this stage. TranS1's allegations go beyond that in *LifeWatch* in asserting consistent misinterpretations of medical literature.[5] Multiple policies citing medical literature as finding AxiaLIF to have high complication rates, when others would not agree that the medical literature reaches that conclusion, suggests common action. The allegations are thus sufficient to plead an agreement through circumstantial evidence.

---

[5] Defendants attach the relevant medical literature to the Motion and argue that the Blue Plans did not mischaracterize the findings. (*See* ECF Nos. 110-6, 110-7, 110-8, 110-9.) Because the Complaint is based on these documents, the Court may consider them. *See supra* n.3. In reviewing the exhibits, the Court notes that language identified by both TranS1 and Defendants is present. A determination of whether the studies are properly characterized in the alleged Blue Plan policies— i.e., whether the Blue Plans should have focused on language identified by Defendants or the language identified by TranS1—is improper at this stage.

### B.      TranS1 Product Market

Defendants argue that the Complaint does not allege a plausible product market because single-level L5-S1 spinal fusion is a medical procedure, not a medical device. (ECF No. 110-1 at 19.) Thus, the Complaint's allegation that the sellers are spinal fusion device-makers and buyers are principally health insurers is meaningless. (*Id.*) Relatedly, Defendants argue that TranS1 is not a consumer or competitor in the market for L5-S1 spinal fusions as it has not alleged it performs the procedures or that it is reimbursed by Defendants. (*Id.*)

The question of product market definition implicates two separate issues. First, antitrust standing requires establishing that a plaintiff's injury is the type that antitrust laws were designed to redress—understanding the product market is essential for identifying TranS1's injury. Second, Defendants argue that even though TranS1 alleges an agreement that is *per se* illegal, it is not alleviated from the burden of pleading what the product market is.

### 1.      Antitrust Standing

Courts must consider whether "the plaintiff is a proper party to bring a private antitrust action." *Phila. Taxi Ass'n v. Uber Techs., Inc.*, 886 F.3d 332, 343 (3d Cir. 2018)*.* The Supreme Court has articulated several factors to assess whether a plaintiff has antitrust standing:

1.  the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm;
2.  whether plaintiff's injury is the type the antitrust laws were designed to redress;
3.  the directness of the injury, avoiding speculative claims;
4.  the existence of more direct victims of the alleged antitrust violations; and
5.  the potential for duplicative recovery or complex apportionment of damages.

*Associated Gen. Contractors of Cal., Inc. v. Cal. St. Council of Carpenters*, 459 U.S. 519, 537–45 (1983); *Ethypharm S.A. Fr. v. Abbott Lab'ys*, 707 F.3d 223, 232–33 (3d Cir. 2013).

To plead antitrust injury, a plaintiff must plead an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Alberta*

*Gas Chems. Ltd. v. E.I. Du Pont de Nemours & Co.*, 826 F.2d 1235, 1240 (3d Cir. 1987) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). Determining whether a plaintiff alleges an antitrust injury depends on how the market is defined. *See Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 182 (3d Cir. 1997).

The Court finds that the Complaint does not sufficiently allege that TranS1's injury is the type the antitrust laws were designed to redress. Fundamentally, it is unclear from the Complaint whether the market is for a spinal procedure or for a product used in the procedure.[6] TranS1 alleges that it owns all rights to the AxiaLIF procedure and associated medical devices, but it does not appear from the Complaint that TranS1 conducts the procedure. There are insufficient facts explaining the relationship between TranS1 and surgeons who perform the procedure, and in turn explaining the relationship between TranS1 and insurers. Thus, TranS1 has not alleged it is a competitor in the market. *See Ethypharm*, 707 F.3d at 235–36 (finding that the plaintiff, a drug manufacturer who operates in the United States market only through a distributor, is not a competitor in the market with defendant because it does not directly sell and distribute the product in the United States). If TranS1's role in this market is solely as a supplier, "[a] supplier does not suffer an antitrust injury when competition is reduced in the downstream market in which it sells goods or services." *West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 102 (3d Cir. 2010). That is because such losses are "merely byproducts of the anticompetitive effects of the restraint," which is insufficient to show antitrust injury. *Id.*; *see also Acad. of Allergy & Asthma in*

---

[6] At oral argument, counsel for TranS1 provided additional explanation of the product market it seeks to allege as well as the relationship between TranS1, surgeons, and AxiaLIF. But the Court looks to the allegations stated in the Complaint in deciding a motion to dismiss. *See Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988). Such additions to the allegations are appropriately incorporated through an amended complaint rather than in briefing or oral argument.

*Primary Care v. Amerigroup Tennessee, Inc.*, 155 F.4th 795, 810 (6th Cir. 2025) ("When third-party harm is mere 'collateral damage' to (or 'a tangential byproduct of') the anticompetitive conduct, the harm does not count as an antitrust injury.").

The third, fourth, and fifth *Associated General Contractors* factors are similarly not sufficiently alleged. It is unclear how direct or indirect an insurer's coverage decision is to TranS1's alleged injury. The Complaint alleges that "providers, hospitals, and patients rely on insurers for reimbursement" for spinal fusions. (ECF No. 1 ¶ 137.) Notably, TranS1 is not included in this list, but this list provides potential options for more direct victims. TranS1 does not allege it ever had a direct contractual relationship with a Blue Plan, unlike the allegations in *LifeWatch*.

### 2.    TranS1's Alleged *Per Se* Illegal Agreement

Further, due to the unclear allegations of product market, TranS1 has failed to sufficiently allege that the agreement is unreasonable. Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. Because nearly every agreement concerning trade is a restraint, Section 1 has been interpreted to only prohibit contracts, combinations, or conspiracies that unreasonably restrain trade. *See In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 356 (3d Cir. 2004). However, some restraints of trade are *per se* unreasonable, as they are "manifestly anticompetitive or would always or almost always tend to restrict competition." *Id.* (quoting *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 461 (3d Cir. 1998)).

TranS1 asserts it alleges an agreement that is *per se* illegal, and thus it is not required to plead a relevant market. If an agreement is *per se* illegal, a relevant market need not be "precisely define[d]," *Ohio v. Am. Express Co.*, 585 U.S. 529, 545 n.7 (2018), but the plaintiff is not wholly

19

excused from defining what the product market is. Moreover, while group boycotts are treated as unlawful *per se*, "the *per se* approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor." *LifeWatch*, 902 F.3d at 336 n.9 (quoting *F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458 (1986)). As in *LifeWatch*, TranS1 has not alleged this type of group boycott.

## IV.     CONCLUSION

The Complaint must be dismissed because of the lack of clarity in the definition of the product market and TranS1's role. However, the Court disagrees with Defendants' assertion that the Complaint should be dismissed with prejudice. Specifically, Defendants assert that there is no direct relationship between TranS1 and Defendants, and TranS1's claims are barred as indirect claims under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). But privity between plaintiffs and defendants is not required to pursue an antitrust suit. *See Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 482 (7th Cir. 2002) (collecting cases). *But see Acad. of Allergy*, 155 F.4th at 815 (stating that *Illinois Brick* requires "contractual privity" to recover lost sales). Thus, while an amended complaint will need to expand upon the product market and TranS1's role as a competitor or consumer in that market, it remains possible that TranS1 can allege antitrust standing.

For the foregoing reasons, the Motion is granted. An appropriate Order follows.

**BY THE COURT:**

**/s/ Hon. Kelley B. Hodge**

**HODGE, KELLEY B., J.**

20